# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ARCHINACO/BRACKEN LLC, | ) |
| Plaintiff, | ) ) ) Civil Action No. 13-917 |
| v. | ) Judge Nora Barry Fischer |
| JAMES DAWSON, GATES EISENHART DAWSON, | ) ) ) ) |
| Defendants. | ) ) |

## MEMORANDUM ORDER

This action arises out of a dispute between Plaintiff Archinaco/Bracken LLC ("Archinaco Bracken"), a law firm, and Defendants, James L. Dawson and his law firm Gates Eisenhart Dawson ("GED"), over the representation of an individual, Nathan Walsh, in a FINRA arbitration claim against Mr. Walsh's former employer and potential client referrals from Mr. Walsh. (Docket No. 1-2). The complaint alleges two counts: (1) intentional interference with contractual relations; and (2) intentional interference with prospective contractual relations. *Id.* ¶¶ 41-59.

Archinaco-Bracken filed this lawsuit in the Allegheny County Court of Common Pleas, on June 12, 2013, *id.* at 2-3, and Defendants filed a Notice of Removal to this Court on June 28, 2013. (Docket No. 1). Pending before the Court is Defendants' Motion to Dismiss, asserting lack of personal jurisdiction under Rule 12(b)(2), improper venue under Rule 12(b)(3), and, in the alternative, Motion to Transfer to the Northern District of California under 28 U.S.C. § 1406(a). (Docket No. 7). This matter has been fully briefed by the parties, and the Court held a motion hearing on August 20, 2013. (Docket Nos. 7; 9-11; 13-15). After consideration of the parties' arguments, the Court denies the Defendants' Motion for the following reasons.

I.    Plaintiff's Allegations[1]

Plaintiff Archinaco Bracken is a law firm and a Pennsylvania Limited Liability Company with a registered address in Pittsburgh, Pennsylvania. (Docket No. 1-2 ¶ 1). Defendant James L. Dawson is an attorney and citizen of California, and Defendant GED is a law partnership with a principal place of business in San Jose, California. *Id.* ¶¶ 2-3. At all relevant times, Mr. Archinaco acted within his scope of employment with Archinaco Bracken, and Mr. Dawson acted within his scope of employment with GED. *Id.* ¶ 4.

Archinaco Bracken avers that on July 30, 2012, a potential client, Nathan Walsh, sought the assistance of Mr. Archinaco to pursue a cause of action against Jeffrey J. Powell, Polaris Equity Management, Inc., and Polaris Wealth Advisors, LLC. *Id.* at 5, 16-40. This action included claims for breach of contract, partnership, and joint venture; breach of implied covenant of good faith and fair dealing; promissory estoppel; fraud; negligent misrepresentation; conversion; wrongful termination; and prima facie tort. *Id.* at 16-40. To formalize the representation, Mr. Walsh and Archinaco Bracken allegedly executed a contingency fee agreement on August 10, 2012, after which Archinaco Bracken claims that it advanced costs on Mr. Walsh's behalf, spent more than one hundred (100) hours representing him, and responded to more than one hundred (100) emails and phone calls from him. *Id.* ¶¶ 5-8.

Subsequently, on April 17, 2013, Archinaco Bracken purportedly filed a Statement of Claim with FINRA on behalf of Mr. Walsh, and on April 29, 2013, FINRA apparently advised Archinaco Bracken that FINRA may not have mandatory jurisdiction, which could require Mr. Walsh's matter to be filed in California state court. *Id.* ¶¶ 9-10. Archinaco Bracken claims, however, that Mr. Walsh terminated Archinaco Bracken on May 24, 2013, allegedly before

---

[1] As discussed in Part II.A, in ruling on a motion to dismiss under Rule 12(b)(2), the plaintiff's allegations are assumed to be true, and all factual disputes are drawn in the plaintiff's favor. *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir. 2004).

FINRA made a final determination and as Archinaco Bracken prepared to file a brief setting forth citations to FINRA's code to establish jurisdiction. *Id.* ¶¶ 11, 33.

Meanwhile, on April 30, 2013, Mr. Archinaco, ostensibly at the request of Mr. Walsh, had spoken with Mr. Dawson about the possibility of Mr. Dawson participating in the case on an apparently local counsel basis only. *Id.* ¶ 16. Mr. Archinaco and Mr. Dawson purportedly agreed that Mr. Walsh's attorney fees would not increase, but that Archinaco Bracken would supposedly partially share with Mr. Dawson any fees from the case. *Id.* ¶ 19. Mr. Archinaco avers that he did not authorize Mr. Dawson to speak with Mr. Walsh *ex parte* or negotiate with Mr. Walsh directly, and that Mr. Dawson knew that Archinaco Bracken represented Mr. Walsh. *Id.* ¶¶ 21-22. Mr. Dawson then apparently requested and received from Mr. Archinaco a copy of Archinaco Bracken's work product, which included Archinaco Bracken's Statement of Claim, consisting of twenty-five (25) pages, one-hundred sixty (160) paragraphs, and nine (9) counts, to get up to speed on the case. *Id.* ¶¶ 23-24. After providing Mr. Dawson with the Statement of Claim, Archinaco Bracken seemingly continued to work on the FINRA jurisdictional issue, speaking with FINRA numerous times. *Id.* ¶ 25.

Mr. Dawson, however, allegedly engaged in *ex parte* communications with Mr. Walsh, began to represent him, and convinced him to enter into an agreement with GED and to terminate Archinaco Bracken. *Id.* ¶¶ 26-27. According to Archinaco Bracken, on May 23, 2013, after Mr. Archinaco sent Mr. Walsh an email, Mr. Dawson responded, indicating that Mr. Walsh had terminated Archinaco Bracken and instructing the cessation of all work. *Id.* ¶¶ 29-30. Later that day, Mr. Dawson ostensibly emailed Mr. Archinaco to advise that Mr. Archinaco was "entitled to the reasonable value of [his] services. Please forward whatever [he has] which indicates the amount of time that [he has] spent on this matter ...." *Id.* ¶ 31. The next day, Mr.

Walsh apparently authorized Archinaco Bracken to release his client file to Mr. Dawson. *Id.* ¶ 32. Mr. Walsh also sent an email indicating that he "wanted to thank [Mr. Archinaco] with [his] utmost gratitude for [Archinaco Bracken's] assistance in [his] legal matter. [Mr. Archinaco's] counsel has meant a great deal to [him] ...." *Id.* ¶ 33. Mr. Archinaco then provided Mr. Dawson with a transition memo on the file. *Id.* ¶ 34.

In addition, supposedly in response to Mr. Dawson's email requesting the reasonable value of services rendered, Mr. Archinaco provided GED with an invoice for $56,680.80, which encompassed his firm's attorneys' fees and costs as advanced on Mr. Walsh's behalf. *Id.* ¶ 36. Mr. Dawson, however, allegedly responded by personally attacking Mr. Archinaco, accusing him of engaging in criminal conduct for sending the invoice, and sharing this accusation with Mr. Walsh. *Id.* ¶¶ 37-38. Archinaco Bracken avers that previously, Mr. Walsh had referred a potential client to Mr. Archinaco during the course of his representation of Mr. Walsh. *Id.* ¶ 39. Archinaco Bracken now claims injury from an existing and a prospective contractual relationship with Mr. Walsh and any future referrals. *Id.* ¶¶ 39-40, 43-49, 52-56.

## II. Discussion

Defendants filed this Motion to Dismiss on July 22, 2013, asserting lack of personal jurisdiction, improper venue, or in the alternative, a motion to transfer pursuant to 28 U.S.C. § 1406(a). (Docket No. 7). The Court addresses each issue, in turn.

### A. Personal Jurisdiction

The Court first addresses the issue of personal jurisdiction over Defendants. "To survive a motion to dismiss for lack of personal jurisdiction, a plaintiff bears the burden of establishing the court's jurisdiction over the moving defendants." *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir. 2004). "Although the plaintiff bears the burden of demonstrating the facts that

establish personal jurisdiction, in reviewing a motion to dismiss under Rule 12(b)(2), we must accept all of the plaintiff's allegations as true and construe disputed facts in favor of the plaintiff." *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 368 (3d Cir. 2002) (citing *Mellon Bank (East) PSFS Nat'l Ass'n v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992); *Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 142 n.1 (3d Cir. 1992)). "[W]hen the court does not hold an evidentiary hearing on the motion to dismiss, the plaintiff need only establish a prima facie case of personal jurisdiction and the plaintiff is entitled to have its allegations taken as true and all factual disputes drawn in its favor." *Miller Yacht Sales*, 384 F.3d at 97.

It is well-settled that to establish personal jurisdiction, a "federal court sitting in diversity must undertake a two-step inquiry." *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 259 (3d Cir. 1998). First, the court must apply the relevant state long-arm statute; second, the court must apply due process. *Id.* Under Pennsylvania's long-arm statute, this Court may exercise personal jurisdiction over a defendant if the cause of action "[c]aus[es] harm or tortious injury in this Commonwealth by an act or omission outside this Commonwealth." 42 Pa. C.S. § 5322. The Third Circuit has thus noted that "Pennsylvania's long arm statute authorizes personal jurisdiction over entities to the fullest extent permitted under the United States Constitution." *Kehm Oil Co. v. Texaco, Inc.*, 537 F.3d 290, 299 (3d Cir. 2008) (citing 42 Pa. C.S. § 5322).

Under the U.S. Constitution, "[d]ue process requires that the defendant have 'minimum contacts' in the forum state, and that the exercise of jurisdiction comport with 'traditional notions of fair play and substantial justice.'" *Remick v. Manfredy*, 238 F.3d 248, 255 (3d Cir. 2001) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). The Supreme Court has explained that "minimum contacts must have a basis in 'some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus

5

invoking the benefits and protections of its laws.'" *Asahi Metal Indus. Co. v. California*, 480 U.S. 102, 109 (1987) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).

Personal jurisdiction may be based on general contacts or "claim-specific contacts with the forum." *Remick*, 238 F.3d at 255. Unlike general jurisdiction, which requires "continuous and systematic" contacts with the forum, specific jurisdiction is present if the defendant "'should reasonably anticipate being haled into court' in that forum." *Id.* (quoting *Vetrotex Certainteed Corp. v. Consol. Fiber Glass Prod. Co.*, 75 F.3d 147, 151 (3d Cir. 1996)). In *IMO Industries, Inc. v. Kiekert AG*, the Third Circuit applied the well-known *Calder* "effects test" to hold that a plaintiff must demonstrate three elements to establish personal jurisdiction:

> (1) The defendant committed an intentional tort;
> (2) The plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort;
> (3) The defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity.

*IMO Indus., Inc.*, 155 F.3d at 265-66 (citing *Calder v. Jones*, 465 U.S. 783, 804 (1984)).

In *Remick v. Manfredy*, 238 F.3d 248, 258 (2001), the Third Circuit affirmed *IMO Industries*, holding that with respect to a claim for tortious interference with contractual relations, "[t]ortious interference is an intentional tort, and therefore [the Court] must apply the *Calder* holding ... to determine the existence of personal jurisdiction." *Remick*, 238 F.3d at 260 (citing *IMO Indus.*, 155 F.3d at 266-68). Not only did the plaintiff in *Remick*—who was also a Pennsylvania attorney suing a former client's agent and attorneys—satisfy the first element of establishing an intentional tort, but the plaintiff also established the second and third elements of the *Calder* test. *Id.* (holding that personal jurisdiction was proper because the plaintiff law firm "conducted the majority of his negotiation, consultation, and advice services" for the former

6

client out of the plaintiff's Philadelphia office, and the defendant law firm's tortious conduct "was expressly aimed at injuring [plaintiff attorney] in Pennsylvania where he lives and works").

Here, the Court has personal jurisdiction over Defendants because all three *Calder* elements are satisfied. Archinaco Bracken alleges a claim for tortious interference with contractual relations, which is an intentional tort. *See Remick*, 238 F.3d at 260 ("Tortious interference is an intentional tort, and therefore we must apply the *Calder* holding."). The first *Calder* element is thus met.

As to the second element, Archinaco Bracken purportedly advanced costs on Mr. Walsh's behalf, spent more than 100 hours representing him, and responded to more than 100 emails and phone calls from him out of its Pittsburgh office. (Docket No. 1-2 ¶¶ 5, 7-8). These allegations, which the Court takes as true under Rule 12(b)(2), *see Miller Yacht Sales*, 384 F.3d at 97, establish that Mr. Archinaco "conducted the majority of his negotiation, consultation, and advice services" for Mr. Walsh while in Pittsburgh, and that Pittsburgh was the focal point of the harm suffered by Mr. Archinaco. *See Remick*, 238 F.3d at 260 (holding that a plaintiff's "negotiation, consultation, and advice services ... out of his Philadelphia office" were sufficient to meet the second element of *Calder*). The second element of the *Calder* test is therefore met.

The third *Calder* element is also satisfied. Mr. Dawson's alleged tortious conduct was "expressly aimed at injuring" Mr. Archinaco in Pittsburgh because Mr. Dawson purportedly knew that Mr. Archinaco represented Mr. Walsh, yet still engaged in *ex parte* communications with Mr. Walsh, began to represent him, and allegedly convinced him to enter into an agreement with GED and to terminate Archinaco Bracken. (Docket No. 1-2 ¶¶ 21-22, 26-27). *See Remick*, 238 F.3d at 260 (holding that the "[defendants'] alleged tortious conduct was expressly aimed at injuring [plaintiff] in Pennsylvania where he lives and works," which was sufficient to meet the

third element of *Calder*). Mr. Dawson also supposedly requested and received from Archinaco Bracken attorney work product—i.e., the Statement of Claim, consisting of twenty-five (25) pages, one-hundred sixty (160) paragraphs, and nine (9) counts. (Docket No. 1-2 ¶¶ 23-24). Less than one month later, Mr. Dawson apparently directed Mr. Archinaco to cease all work, writing that Mr. Archinaco was "entitled to the reasonable value of [his] services. *Id.* ¶¶ 29, 31. Mr. Walsh even ostensibly thanked Mr. Archinaco for his assistance, and wrote that Mr. Archinaco's counsel "meant a great deal," suggesting that Mr. Archinaco's services had value. *Id.* ¶ 33. Based on these allegations, which the Court takes as true under Rule 12(b)(2), *see Miller Yacht Sales*, 384 F.3d at 97, Mr. Dawson expressly aimed his alleged tortious conduct at Mr. Archinaco in Pennsylvania, where Mr. Archinaco lives and works, thereby establishing the third element of the *Calder* test. *See Remick*, 238 F.3d at 260.

In sum, all three elements of the *Calder* test are met, and this Court denies Defendants' motion to dismiss for lack of personal jurisdiction. Next, this Court addresses improper venue.

  **B. Improper Venue**

Even though Defendants have moved to dismiss for improper venue, they have failed to meet their burden of demonstrating that venue is improper in this Court. "[A] motion to dismiss for improper venue is not an attack on jurisdiction but only an affirmative dilatory defense." *Myers v. Am. Dental Ass'n*, 695 F.2d 716, 724 (3d Cir. 1982). Under Third Circuit precedent, "the defendant should ordinarily bear the burden of showing improper venue in connection with a motion to dismiss." *Myers*, 695 F.2d at 725. Pursuant to 28 U.S.C. § 1391,

> A civil action may be brought in—(1) a judicial district in which any defendant resides, if all defendants are residents of the State ... (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred ... or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject

8

to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b) (2006).

Here, Defendants have made no attempt to meet their burden to establish improper venue. *See* Defendants' Brief and Supplemental Brief (Docket Nos. 7, 14). Furthermore, venue is proper here because this claim arose in Pittsburgh, where, as discussed above, Archinaco Bracken has met all three parts of the *Calder* test. To this end, Archinaco Bracken alleges that Dawson committed intentional torts in Pittsburgh, Archinaco Bracken spent a significant number of attorney hours representing Mr. Walsh out of its Pittsburgh office, and Defendants expressly aimed their alleged tortious conduct at Archinaco Bracken here. (Docket No. 1-2 ¶¶ 5, 7-8). These allegations establish that "a substantial part of the events or omissions giving rise to the claim occurred" in Pittsburgh. *See* 28 U.S.C. § 1391. Venue is thus proper in this forum, and this Court denies Defendants' motion to dismiss for improper venue. Accordingly, this Court next addresses Defendants' motion to transfer venue under 28 U.S.C. § 1406(a).

### C. Motion to Transfer Venue

In this Court's opinion, Defendants have also failed to meet their burden to demonstrate that a transfer of venue to the Northern District of California is warranted. As a threshold matter, § 1406(a) does not apply to this case because venue is proper in this forum. *See Lafferty v. St. Riel*, 495 F.3d 72, 78 (3d Cir. 2007). Two transfer statutes govern venue transfers in the federal courts. *Compare* 28 U.S.C. § 1404(a), *with* 28 U.S.C. § 1406(a). First, § 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." *Id.* § 1404(a). Second, under § 1406(a), "[t]he district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice,

transfer such case to any district or division in which it could have been brought." *Id.* § 1406(a).

As the Third Circuit has clarified, the distinction between the two transfer statutes concerns "discretion, jurisdiction, and choice of law." *Lafferty*, 495 F.3d at 76. "Section 1404(a) transfers are discretionary determinations made for the convenience of the parties and presuppose that the court has jurisdiction and that the case has been brought in the correct forum." *Id.* By contrast, "[s]ection 1406(a) comes into play where plaintiffs file suit in an improper forum." *Id.* at 77 (citing *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 878 (3d Cir. 1995)). This Court therefore applies § 1404(a) because venue in this forum is proper. *See id.* at 78 ("Many courts have noted that the only relevant distinction between the venue-transfer statutes is simply which of the two principal transfer statutes—§§ 1404(a) and 1406(a)—is appropriate for transfers: the former is appropriate when venue is proper and the latter should be used when venue is improper." (quotation marks and alterations omitted)).

To determine whether to grant a motion to transfer venue under § 1404(a), the district court weighs both private and public interests under *Jumara v. State Farm Insurance Co.*, 55 F.3d 873, 879 (3d Cir. 1995). Private interests include: (1) each party's forum preference; (2) where the claim arose; (3) the convenience of the parties; (4) the convenience of the witnesses; and (5) the location of the books and records. *Id.* Public interests include: (1) the enforceability of the judgment; (2) practical considerations of expediting trial and reducing costs; (3) administrative difficulties in the two fora due to court congestion; (4) the local interest in deciding local controversies; (5) public policies of the fora; and (6) the familiarity of the trial judge with the applicable state law. *Id.* at 879-80. As with motions to dismiss for improper venue, "[t]he burden of establishing the need for transfer still rests with the movant," and "the plaintiff's choice of venue should not be lightly disturbed." *Id.* at 879.

10

After considering all of the relevant private factors, this Court finds that Defendants have not established that transfer of venue should be ordered. Regarding each party's forum preference, Archinaco Bracken filed this lawsuit in Allegheny County. (Docket No. 1-2, at 3-4). Although the Court must also consider Defendants' preference to transfer this case to the Northern District of California, Archinaco Bracken has chosen to sue within the state of its residence, and this factor favors venue in this forum. *Id.* ¶ 1. This claim arose from Defendants' alleged commission of intentional torts in Pittsburgh, as is fully explained above. (Docket No. 1-2 ¶¶ 5-8). Although the Court must also consider the inconvenience to Mr. Dawson and GED, the convenience of both Archinaco Bracken and its employee witnesses favor venue in Pittsburgh. (Docket No. 1-2 ¶¶ 1-5, 7-9). The final factor, the location of the books and records, neither favors nor disfavors transfer because the books and records could probably be produced electronically in either forum. *Id.* ¶ 7. Taken together, each of the private factors either favors venue in this forum or is neutral, which is why on balance, the private interests favor venue in this forum. *See Jumara*, 55 F.3d at 879.

The public interests also favor venue in this forum. Even though a Pennsylvania judgment may require another proceeding in California to be enforceable in California against Defendants, "California law gives judgments from other states the same preclusive effect as the laws of the state in which those judgments were rendered." *Shaffer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. 10-03943, 2011 WL 3047478, at *4 (N.D. Cal. July 25, 2011) (citing *Brinker v. Superior Court*, 1 Cal. Rptr. 2d 358, 360 (1991) ("Under California law, both the validity and effect of a foreign judgment are governed by the laws of the state in which it is rendered."))). This factor thus neither favors nor disfavors transfer.

This case, however, would benefit from the reduced cost for a local law firm to try a case

that arose from injury sustained locally in Pittsburgh, favoring venue in this forum. (Docket No. 1-2 ¶ 7). According to the Federal Court Management Statistics, moreover, the Western District of Pennsylvania had 3,373 filed cases before ten District Judges for an average of 337 cases per Judge and a "weighted filing" score of 346 in the twelve months ending March 31, 2013.[2] *See Federal Court Management Statistics*, www.uscourts.gov, http://www.uscourts.gov/Statistics/FederalCourtManagementStatistics.aspx (last visited Sept. 24, 2013). By comparison, the Northern District of California had 7,816 filed cases before fourteen District Judges for an average of 558 cases per Judge and a "weighted filing" score of 652 during the same period. *Id.* Given that the Northern District of California is relatively more congested, this factor weighs in favor of retaining the case here. In sum, numerous *Jumara* factors support retaining venue in the Western District of Pennsylvania, the remaining factors are neutral, and the plaintiff's choice of forum should be given deference; thus, this Court denies Defendants' motion to transfer venue to the Northern District of California. *See Jumara*, 55 F.3d at 879.

**III.    Conclusion**

For the foregoing reasons,

IT IS HEREBY ORDERED that Defendants' Motion to Dismiss for Lack of Personal Jurisdiction Pursuant to FRCP Rule 12(b)(2) or in the Alternative to Dismiss on the Ground that Venue in this Action is Improper Pursuant to FRCP Rule 12(b)(3) or in the Alternative to Transfer this Action to the Northern District of California Pursuant to 28 U.S.C. § 1406(a) [7] is DENIED.

---

[2] The Court notes that the number of District Judges in this District will soon be reduced to seven. Although statistics are not publicly available, dividing the total number of cases of 3,373 among seven judges would be 482 cases per District Judge in the Western District of Pennsylvania, compared with 558 cases per District Judge in the Northern District of California. *See Federal Court Management Statistics*, www.uscourts.gov, http://www.uscourts.gov/Statistics/FederalCourtManagementStatistics.aspx (last visited Sept. 24, 2013).

IT IS FURTHER ORDERED that Defendants shall file an Answer within fourteen (14) days of this order, i.e., by October 8, 2013.

> *s/ Nora Barry Fischer*
> Nora Barry Fischer
> United States District Judge

Date:   September 24, 2013
cc/ecf: All counsel of record